# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

### HELENA DIVISION

| | |
|---|---|
| LLOYD SCOTT MAIER, | Cause No. CV 08-26-H-DWM-RKS |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANT DEFENDANTS MECKLING AND MACDONALD'S CROSS MOTION FOR SUMMARY JUDGMENT |
| ROSS SWANSON, MICHELLE STEYH, MIKE FERRITER, WARDEN SAM LAW, JOHN MECKLING and MARTIN MAVRINAC, | |
| Defendants. | |

At issue are Plaintiff's Motion for Summary Judgment as to Defendants MacDonald and Meckling (Document 56) and Defendants MacDonald and Meckling's Cross-Motion for Summary Judgment. (Document 68).

## I. STATEMENT OF THE CASE

### A.    Jurisdiction

Plaintiff filed his Complaint pursuant to 42 U.S.C. § 1983 and the Religious

Land Use and Institutionalized Persons Act of 2000 ("RLUIPA").  Plaintiff alleges

violations of his religious rights while incarcerated at Crossroads Correctional

Center and the Montana State Prison.  There is federal question jurisdiction

pursuant to 28 U.S.C. § 1331.

### B.    Parties

Plaintiff is a state prisoner incarcerated at the Montana State Prison in Deer

Lodge, Montana.  He was incarcerated at Crossroads Correctional Center in

Shelby, Montana from March 14, 2007 to September 18, 2007.

The named Defendants from Crossroads Correctional Center are Warden

Jim MacDonald and Chaplain John Meckling.  Sam Law has replaced Jim

MacDonald as Warden of Crossroads Correctional Center.  As Plaintiff named

Defendant MacDonald in his official capacity only, the caption of the case is

amended (as set forth above) naming Warden Sam Law as a Defendant rather than

former Warden MacDonald.  *See* Fed.R.Civ.P. 25(d) (An action does not abate

when a public officer who is a party in an official capacity dies, resigns, or

otherwise ceases to hold office while the action is pending.  The officer's

successor is automatically substituted as a party).[1]

---

[1] Any reference to "Defendants" herein refers only to Defendants Law and Meckling. Defendants Mavrinac, Swanson, Steyh, and Ferriter's Motion for Summary Judgment is analyzed separately.

### C.     Plaintiff's Allegations

Plaintiff alleged the Crossroads Defendants violated the First Amendment
and RLUIPA by denying his request for Tarot cards while he was incarcerated in
Administrative Segregation at Crossroads Correctional Center.

## II. STANDARD

A party is entitled to summary judgment if they demonstrate "there is no
genuine issue as to any material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is
appropriate where the documentary evidence produced by the parties permits only
one conclusion. _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 251 (1986).

The party seeking summary judgment bears the initial burden of setting
forth the basis of the motion and identifying those portions of the pleadings,
depositions, answers to interrogatories, and admissions on file, together with
affidavits, if any, which demonstrate the absence of a genuine issue of material
fact. _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986).

Where the moving party meets this burden, the party opposing the motion
"may not rest upon the mere allegations or denials of his pleading, but . . . must
set forth specific facts showing that there is a genuine issue for trial." _Anderson,
477 U.S. at 248_. The non-moving party may do this by use of affidavits (including

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE-CV-08-26-H-DWM-RKS / PAGE 3

his own), depositions, answers to interrogatories, and admissions.

"A verified complaint may be used as an opposing affidavit under Rule 56."[2] *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (citing *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987)).  "To function as an opposing affidavit, however, the verified complaint must be based on personal knowledge and set forth specific facts admissible in evidence." *Id.* (citing Fed.R.Civ.P. 56(e); *McElyea*, 833 F.2d at 197; *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985)).

Plaintiff "must produce at least some 'significant probative evidence tending to support the complaint.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(citations omitted).  Only disputes over facts that might affect the outcome of the suit under the governing law are "material" and will properly preclude entry of summary judgment. *Anderson*, 477 U.S. at 248.  At the summary judgment stage, the Court does not weigh the evidence or determine the truth of the matter, but ascertains whether there is a genuine issue for trial.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

The mere existence of a scintilla of evidence in support of the [non-

---

[2]The Court has construed Plaintiff's Complaint as a verified complaint.

moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

*Anderson*, 477 U.S. at 252.

Additionally, "[a] document filed pro se is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam); Cf. Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice").

## III.  UNDISPUTED FACTS

Plaintiff was housed at the Crossroads Correctional Center ("CCC") in Shelby, Montana from March 14, 2007 to September 18, 2007. (Document 61–MacDonald and Meckling's Amended Answer, p. 2, ¶ 2).

Plaintiff practices Wicca[3] or Witchcraft. (Document 2-2:  Statement of Claims, p. 1).  Wiccan inmates in general population at CCC are provided with a

---

[3]"Wicca is a polytheistic faith based on beliefs that prevailed in both the Old World and the New World before Christianity.  Its practices include the use of herbal magic and benign witchcraft." *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 400 (7th Cir. 2003) (internal quotation omitted). Merriam Webster's Dictionary defines Wicca as, "a religion that affirms the existence of supernatural power (as magic) and of deities who inhere in nature and that ritually observes seasonal and life cycles."

weekly meeting in the prison chapel.  (Document 71-2:  Law Affidavit, ¶6).

General population Wiccan inmates have various items available for group

religious use in the prison chapel.  These items include the Book of Shadows, an

altar cloth, altar pentacle, chalice, devotional bowls, bell, unlit candles, mortar and

pestle, sea salt, and various herbs.  (Document 71-2:  Law Affidavit, ¶6).  General

population Wiccan inmates may also have various items in their prison cells as

specified on the "Allowable Wiccan Religious Items In-Cell" list effective as of

June 15, 2006. (Document 71-2:  Law Affidavit, ¶ 6).  These items include an

amulet, altar cloth, Book of Shadows, bell, pentacle, divination tools including one

set of tarot cards and rune stones, specified herbs, sea salt, crocheted candles, and

an approved storage container.  (Document 71-2:  Law Affidavit, ¶ 6).

The CCC segregation policy is based on American Correctional Association

standards and was approved by the Montana Department of Corrections.

(Document 71-2:  Law Affidavit, ¶ 10).  The CCC segregation policy, Policy 10-

100, was compiled by the prison warden, executive staff, quality assurance

managers, and with input from the various prison unit managers.  (Document 71-2:

Law Affidavit, ¶ 10).

Policy 10-100 defines inmates classified in administrative segregation as

those "whose continued presence in the general population poses a serious threat

to life, property, self, staff, or other inmates, or to the security or orderly running of the institution." (Document 71-2: Law Affidavit, ¶ 8).  Segregation inmates are, in general, the worst of the worst as far as prison management is concerned. These inmates have proven by their history of behavior in prison that it is necessary to hold them in the "rigorous regime of confinement." (Document 71-2: Law Affidavit, ¶ 8).

Plaintiff was classified as an administrative segregation inmate at CCC because he was written up for disciplinary infractions including threats of bodily harm, cursing at and belittling staff, and repeatedly refusing to obey orders from prison staff.  Plaintiff's actions were sometimes violent and generally disruptive. (Document 71-2: Law Affidavit, p. 3, ¶ 9).

Policy 10-100 restricts nearly every aspect of the daily prison routine for administrative segregation inmates. (Document 71-2, pp. 6-16:  Policy 10-100). One such restriction is a limit on the amount of property they may have. (Document 71-2:  Law Affidavit, ¶ 10; Policy 10-100, pp. 6-7).  Administrative segregation inmates are only allowed the personal property items on the Policy 10-100 property matrix.  Tarot cards are not included on that property matrix. (Document 71-2:  Law Affidavit, ¶ 10; Policy 10-100, pp. 6-7).

The CCC segregation policy allows inmates of any religion to practice their

religion by keeping in their cell, among other items, "[o]ne Bible/Koran/Quaran –

or similar religious text."  (Document 71-2:  Law Affidavit, ¶ 11; Policy 10-100,

pp. 6-7).  Administrative segregation inmates are also provided access to

counseling services and religious guidance. (Document 71-2:  Law Affidavit, ¶ 11;

Policy 10-100, pp. 6-7).

On April 19, 2007, Plaintiff sent an inmate letter to Chaplain Meckling

requesting his tarot cards and book.  (Document 2-3, p. 14--April 19, 2007 Inmate

Letter to Chaplain Meckling; Document 29–Defendants' Answer, p. 3, ¶ 9).[4]  On

April 24, 2007, Chaplain Meckling responded stating, "Wicca has a number of

books that can be considered the Wicca Bible.  Taro cards as [sic] for divination

and not a Bible."  (Document 2-3, p. 14--April 19, 2007 Inmate Letter to Chaplain

Meckling; Document 29–Defendants' Answer, p. 3, ¶ 10).

On April 26, 2007, Chaplain Meckling answered Plaintiff's April 25, 2007

informal resolution form requesting his "Taro Card & Book" by saying:  "When I

spoke with you on 4/25/07 I said Taro cards are for divination and not a Wicca

Bible.  If I had a Wicca Bible, I would have given you that bible.  I am looking

into what book you are referring to, with property.  You can practice your religion

---

[4]The inmate grievance forms submitted with Plaintiff's Complaint and with Defendants'
Motion for Summary Judgment have been considered as undisputed evidence because both parties
submitted the documents and/or the evidence was admitted to in Defendants' Answer.

with the proper materials."  (Document 2-3, p. 13).

## IV.  ANALYSIS

Plaintiff brought his claims under both the First Amendment Free Exercise Clause of the United States Constitution and the Religious Land Use and Institutionalize Persons Act, 42 U.S.C. § 2000cc to 2000dd-1.[5]  In some ways the analysis of these two claims mirrors each other.  But RLUIPA mandates a stricter standard of review for prison regulations. *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. 2008).  RLUIPA provides for the strict scrutiny of a religious infringement, while the First Amendment merely requires a rational basis analysis. *See Cutter v. Wilkinson*, 544 U.S. 709 (2005); *Henderson v. Terhune*, 379 F.3d 709, 715 n. 1 (9th Cir. 2004).

The First Amendment to the United States Constitution states in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."  In order for a religious claim to merit protection under this clause, the claim must first meet two criteria:  (1) the proffered belief must be sincerely held; and (2) "the claim must be rooted in religious belief, not in 'purely secular' philosophical concerns." *Callahan v.*

---

[5]Plaintiff actually stated his claims were brought under "RFRA or the RLUIPA or both." (Document 2-2, p. 1).  The Supreme Court struck down the Religious Freedom Restoration Act (RFRA) as applied to the states in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).  Accordingly, Plaintiff's claims will only be analyzed under RLUIPA.

*Woods*, 658 F.2d 679, 683 (9th Cir. 1981).   That is, "whether the plaintiff's claim

is related to his sincerely held religious belief." *Malik v. Brown*, 16 F.3d 330, 333

(9th Cir. 1994); *see also Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008).  If a

regulation infringes on a "sincerely held religious belief" it is only valid if it is

"reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S.

78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

Similarly, the Religious Land Use and Institutionalized Persons Act, 42

U.S.C. § 2000cc et seq. , provides in relevant part:

> No government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution . . . even
> if the burden results from a rule of general applicability, unless the
> government demonstrates that imposition of the burden on that person
> > (1) is in furtherance of a compelling governmental interest; and
> > (2) is the least restrictive means of furthering that compelling
> > governmental interest.

42 U.S.C. § 2000cc-1(a).  To establish a RLUIPA violation, the plaintiff bears the

initial burden to prove the defendants' conduct places a "substantial burden" on his

"religious exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).

Once the plaintiff establishes a substantial burden, defendants must prove the

burden both furthers a compelling governmental interest and is the least restrictive

means of achieving that interest.  *Id.* at 995.  RLUIPA is "to be construed broadly

in favor of protecting an inmate's right to exercise his religious beliefs."

*Warsoldier*, 418 F.3d at 995 (citing 42 U.S.C. § 2000cc-3(g)).

Both the First Amendment and RLUIPA require a showing that a particular regulation has substantially burdened (RLUIPA) or infringed (First Amendment) upon a sincerely held religious belief.  The First Amendment analysis then turns to whether the regulation is reasonably related to legitimate penological interests. RLUIPA considers whether the regulation is the least restrictive means of furthering a compelling governmental interest.

**A.  Substantial Burden/Infringement on Sincerely Held Religious Belief**

RLUIPA defines "religious exercise" as  "'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.' " *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir.2005) (quoting 42 U.S.C. § 2000cc-2(a)). To merit protection under the First Amendment, a religious claim must be sincerely held and must be "rooted in religious belief, not in 'purely secular' philosophical concerns." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (internal citations omitted); *Shakur*, 514 F.3d at 885 (9th Cir. 2008).  The issue is whether the plaintiff sincerely believes the religious practice is consistent with his faith. *Shakur*, 514 F.3d at 885.

Both RLUIPA and the First Amendment "bar[s] inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." *Cutter v.*

*Wilkenson*, 544 U.S. 709, 725, n. 13 (2005)(RLUIPA); *Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)("[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.")(First Amendment).  After *Shakur*, the only issue is whether Plaintiff sincerely believes he needs his Tarot Cards to be consistent with his faith.

Presumably Defendants do not contest that the use of Tarot cards is an exercise of religion since Tarot Cards are listed by CCC as "allowable Wiccan Religious Items" in general population cells.  (Document 71-2, p. 27).  Moreover, at this stage and with the present evidence the Court cannot question of the sincerity of Plaintiff's beliefs.  It is a commonplace of federal practice that a party's state of mind "is not readily susceptible to resolution on a motion for summary judgment." *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1231 (E.D.Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).  Therefore, for purposes of this motion, the Court will assume the use of Tarot Cards was a sincerely held religious belief.

RLUIPA then requires Plaintiff to demonstrate that the prison's policies or actions constitute a substantial burden on the exercise of his religious beliefs. *Warsoldier*, 418 F.3d at 994.  The Ninth Circuit defines substantial burden as one that is "'oppressive' to a 'significantly great' extent.  That is, a 'substantial burden,

on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Warsoldier*, 418 F.3d at 995 (*quoting San Jose Christian coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).  The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience." *Navajo Nation*, 535 F.3d 1058, 1092 (9th Cir. 2008) (internal citations omitted).

Plaintiff identifies his religion as Wicca or Witchcraft.  He contends using Tarot cards is the way a Wiccan practices religion and Defendants violated his rights when they refused to allow him to have his Tarot Cards even though they passed out Bibles to other inmates.[6]  Plaintiff contends Defendants have placed a substantial burden on his religion.

In this case, it is unclear how to determine whether the prison's restriction is a substantial burden on Plaintiff's religious beliefs without questioning the centrality of those particular beliefs or practices.  The Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997),

---

[6]Plaintiff's Complaint alleges Chaplain Meckling told him he was not allowed to practice Wicca in Administrative Segregation.  That claim is belied by Chaplain Meckling's April 26, 2007 response to Plaintiff's informal grievance wherein Chaplain Meckling stated, "If I had a Wicca Bible, I would have given you that bible.  I am looking into what book you are referring to with property. You can practice your religion with the proper materials." (Document 2-3, p. 13).  Numerous other grievance responses stated Plaintiff was allowed to practice his religion using the proper materials. (Documents 71-2, pp. 30, 31, 33).  Thus, the Court has focused its analysis on whether the denial of the Tarot Cards violated Plaintiff's rights.

quoting, *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 907, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)(O'Connor, J., concurring in the judgment) noted, "The distinction between questions of centrality and questions of sincerity and burden is admittedly fine."

Without specifically deciding whether the denial of Tarot Cards placed a substantial burden on Plaintiff's religious exercise, the Court will assume, for purposes of this motion only, there was a substantial burden/infringement on Plaintiff's sincerely held religious beliefs.

**B.  Turner Factors**

The relevant *Turner* factors in determining whether a regulation, or its application in a particular situation, is reasonable are as follows:  (1) whether there is a valid, rational connection between the regulation and a legitimate and neutral government interest, (2) whether there are alternative means of exercising the constitutional right, (3) the impact the accommodation of the right will have on prison staff and other prisoners, and (4) whether the regulation is an exaggerated response to prison concerns, in light of readily available alternatives. *Turner*, 482 U.S. at 89-91.

1.  Connection between regulation and government interest

Defendants must first establish a "common-sense" connection between their

policy and a legitimate penological interest.  *See Frost v. Symington*, 197 F.3d 348, 357 (9th Cir. 1999).  If Defendants do so, Plaintiff must present evidence refuting the connection. *Id.*  Defendants must then present enough counter-evidence to show the connection is not "so remote as to render the policy arbitrary or irrational." *Id.*

In *Cutter*, 544 U.S. at 722, 125 S.Ct. 2113, the Supreme Court acknowledged that "maintain[ing] good order, security and discipline, consistent with consideration of costs and limited resources," is a compelling government interest.  The Court must exhibit a "particular sensitivity to security concerns" and be "mindful of the urgency of discipline, order, safety, and security in penal institutions." *Cutter*, 544 U.S. at 722-23.  It is undisputed that prison security is a legitimate penological interest.  *See Turner*, 482 U.S. at 91; *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999) (en banc), cert. denied, 529 U.S. 1018, 120 S.Ct. 1419, 146 L.Ed.2d 311 (2000) ("It is beyond question that both jail security and rehabilitation are legitimate penological interests.").

CCC justifies its segregation policy by arguing it is supported by several legitimate penological purposes including:  1) to serve the rehabilitative goals of the correctional facility by motivating difficult prisoners to behave better by providing them with an incentive to move out of administrative segregation; and

2) to limit the amount of personal property controlled by the inmates in administrative segregation cells in order to maintain security in what is among the highest security areas of the prison, and allowing the prison staff to better and more efficiently detect contraband items.  (Document 71-2:  Law Affidavit, p. 4 ¶¶ 12-13).

The restrictive property policy only applied to administrative segregation inmates whose presence in general population posed a threat to prison security. The policy was put in place to encourage inmates to move out of administrative segregation and to limit the amount of personal property and thus allow prison staff to more effectively detect contraband items.  As Defendants argue, similar justifications were upheld by the United States Supreme Court in *Beard v. Banks*, *548 U.S. 521 (2006)*.  The issue in *Beard* was a restriction on reading material in segregation.

Defendants also cited to *Overton v. Bazzetta*, *539 U.S. 126 (2003)* wherein the Supreme Court upheld a restriction on family visitation privileges for inmates with two substance-abuse violations.  The *Overton* Court held, "[w]ithdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to lose."  *Overton*, *539 U.S. at 134, 123*

S.Ct. at 2169.

Defendants have not cited and the Court cannot find any case specifically upholding a restriction on religious materials to motivate better behavior.  But in light of the United States Supreme Court upholding similar restrictions on First Amendment rights to reading materials and free association, the Court finds the prison's restriction to bear a rational relationship to a legitimate penological interest.

Encouraging discipline is a compelling interest in the prison setting and encouraging proper discipline with limited property, including limited religious property, seems to be an acceptable means of accomplishing this goal.  Plaintiff does not rebut Defendants' assertion that the prohibition against tarot cards in segregation is reasonably related to legitimate penological interests.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350-52, 107 S.Ct. 2400 (1987).  Defendants have provided a rational connection between the ban and legitimate penological objectives.  This regulation is reasonably related to a legitimate penological interest-prison security. See *Casey v. Lewis*, 4 F.3d 1516, 1521 (9th Cir. 1993).

### 2.  Alternative means of exercising religious right

Plaintiff does not dispute that Defendants' policies allowed him to have a religious text and access to counseling services and religious guidance while in

administrative segregation.  Thus, Plaintiff had available alternative means of exercising his religious rights.  In addition, this restriction was not permanent in that inmates in General Population were allowed Tarot Cards.  Had Plaintiff rectified his behavioral problems, he would have had access to his cards. Moreover, as Defendants point out, the United States Supreme Court has found that an inmate's ability "to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable." *O'Lone*, 482 U.S. at 352, 107 S.Ct. at 2406.

3.  Impact of Accommodation–Alternatives to Regulation

Finally the Court must consider whether "there are ready alternatives to the prison's current policy that would accommodate [Maier] at de minimis cost to the prison." *Ward v. Walsh*, 1 F.3d 873, 879 (9th Cir. 1993).

Prison officials, including former Warden MacDonald, Assistant Warden Law (now Warden), and Security Chief Varnum, in adopting Policy 10-100's personal property restrictions, considered less restrictive personal property restrictions. (Document 71-2:  Law Affidavit, ¶ 13).  The prison officials concluded less restrictive personal property restrictions would have opened the door to allowing all inmates in administrative segregation to be allowed increased personal property that could place the unit in jeopardy and risk the safety and

security of the inmates and staff. (Document 71-2: Law Affidavit, ¶ 13).

Plaintiff does not suggest any less restrictive means than the full ban on Tarot Cards in Administrative Segregation. The limitation is presumably limited should the inmate exhibit clear conduct for a period of time.

There was a valid, rational connection between administrative segregation property restriction and CCC's legitimate and neutral government interest in maintaining security and discipline, Plaintiff had alternative means of practicing his religion, providing Tarot cards in administrative segregation could place the unit in jeopardy and risk the safety and security of the inmates, and Plaintiff did not suggest any other less restrictive measures. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's First Amendment claim should be granted.

### C.  Least Restrictive Means of Furthering Governmental Interest

Regardless of whether there was a substantial burden placed on Plaintiff's religious beliefs, the Court determined above there is a compelling governmental interest (maintaining security and discipline in administrative segregation) and the least restrictive means are utilized to meet that burden. As such, Defendants' Motion for Summary Judgment on Plaintiff's RLUIPA claim should be granted.

### D.  Equal Protection

To the extent Plaintiff claims an equal protection violation based on the fact

that prisoners practicing other religions are given access to religious items that are denied to Wiccans, that claim fails as a matter of law.

The undisputed testimony of Warden Law is that CCC's segregation policy applies with equal force to all inmates, irrespective of their religion. (Document 71-2:  Law Affidavit, ¶ 14).  The personal property matrix is intended to be inflexible, and allowing an inmate to obtain additional items not on the approved list would defeat the rehabilitative and security goals which Policy 10-100 and its personal property limitations are intended to ensure. (Document 71-2:  Law Affidavit, ¶¶ 13-14).

"Prisons must afford an inmate of a minority religion 'a reasonable opportunity of pursuing [their] faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Freeman v. Arpaio*, 125 F.3d 732, 737 (1997) (quoting Cruz, 405 U.S. at 322).  However, prisons need not provide identical facilities or personnel to different faiths, but must make "good faith accommodation of the [prisoners'] rights in light of practical considerations." *Freeman*, 125 F.3d at 737 (citations omitted).

In order to survive summary judgment, Plaintiff "'must set forth specific facts showing that there is a genuine issue' as to whether he was afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths

FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE-CV-08-26-H-DWM-RKS / PAGE 20

and that such conduct was intentional." *Freeman*, 125 F.3d at 737 (citation omitted).  Plaintiff does not meet either of these requirements.  First, Plaintiff does not create a genuine issue as to whether he was afforded a reasonable opportunity to pursue his faith compared to other prisoners of different faiths.  The prison made a good faith accommodation of Plaintiff's religious needs by permitting him to possess a religious text and access to religious counseling.  Second, Plaintiff presented no evidence to suggest Defendants' alleged conduct intentionally deprived him of a reasonable opportunity to pursue his faith as compared to prisoners of other faiths.  Accordingly, summary judgment on this claim is proper.

Based on the foregoing, the Court issues the following:

## RECOMMENDATION

1.  Plaintiff's Motion for Summary Judgment (Document 56) should be **DENIED**.

2.  Defendants MacDonald and Meckling's Cross Motion for Summary Judgment (Document 68) should be **GRANTED**.

3.  Defendants Law and Meckling should be **DISMISSED.**

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written

objections to these Findings and Recommendations within ten (10) business days of the date entered as indicated on the Notice of Electronic Filing.  Any such filing should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

A district judge will make a de novo determination of those portions of the Findings and Recommendations to which objection is made.  The district judge may accept, reject, or modify, in whole or in part, the Findings and Recommendations.  Failure to timely file written objections may bar a de novo determination by the district judge and may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.Civ.P. 4(a)(1), should not be filed until entry of the District Court's final judgment.

DATED this 10th day of April, 2009.

*/s/ Keith Strong*_____
Keith Strong
United States Magistrate Judge